UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

HARTFORD FIRE INSURANCE
COMPANY,

          Plaintiff,

v.

DONALD LAVERNE CLARK, JR., ROBIN
PARSONS, and TRANSGROUP EXPRESS,
INC., a Washington Corporation d/b/a/
TransGroup,

          Defendants.

Case No. 03-CV-3190 (PJS/JJG)

ORDER ON MOTIONS
FOR SUMMARY JUDGMENT

---

Robert L. Reifenberg, CLAUSEN MILLER, P.C.; Teresa J. Kimker, NILAN JOHNSON
LEWIS, P.A., for plaintiff.

James M. Lockhart, Christopher R. Grote, and Kirstin D. Kanski, LINDQUIST &
VENNUM, P.L.L.P., for defendant Transgroup Express, Inc.

This matter is before the Court for the second time on cross-motions for summary

judgment. When the parties first moved for summary judgment, the Court denied the motion of

plaintiff Hartford Fire Insurance Company ("Hartford"), granted the motion of defendant

Transgroup Express, Inc. ("Transgroup"), and dismissed all of Hartford's claims against

Transgroup. Order Sept. 4, 2007 [Docket No. 153]. Hartford successfully appealed to the

Eighth Circuit, which vacated this Court's judgment and remanded the case for further

proceedings. *Hartford Fire Ins. Co. v. Clark*, 562 F.3d 943, 947 (8th Cir. 2009).

The Court denies the parties' post-remand summary-judgment motions in almost all

respects for the reasons explained at length at the hearing on those motions and reflected in the

transcript of that hearing. Only a handful of the numerous issues raised by the parties merit

extended analysis in this order.

# I. BACKGROUND

The relevant facts are set out in the Court's 2007 summary-judgment order and in the Eighth Circuit's opinion on appeal. The Court summarizes those facts only briefly here.

Defendant Donald Clark, Jr., was the shipping and warehouse manager for Buffets, Inc. for about ten years, from 1992 to 2001. Buffets operates several restaurant chains, including Old Country Buffet. Buffets's headquarters is located in Eagan, Minnesota, a suburb of the Twin Cities.

Defendant Robin Parsons ran a shipping company called Carr Freight. Carr Freight was also located in Eagan, about two miles from Buffets. Carr Freight provided shipping services to Buffets. Parsons was a friend of Clark's.

Clark and Parsons hatched a scheme to use Carr Freight to steal from Buffets. The scheme was simple: Clark would place a shipment with Carr Freight, Carr Freight would overbill Buffets for the shipment, Clark would approve payment of the inflated bill, and then Parsons would pay kickbacks to Clark.

Carr Freight was affiliated with defendant Transgroup, a company based in Seattle, Washington. Carr Freight transported goods locally on its own trucks. But when arranging interstate shipments, Carr Freight used other shipping companies to move the goods and used Transgroup's billing and accounting services. The paperwork for such interstate shipments bore Transgroup's name, not Carr Freight's, and payment for such interstate shipments went directly from a customer (Buffets, for instance) to Transgroup. Transgroup kept roughly 11 percent of each payment, paid the company that actually moved the goods, and paid the remainder to Carr Freight.

Sometime in early 2001, executives at Buffets began to suspect that they were overpaying for shipping. After an internal investigation by Buffets, the matter was brought to the attention of the United States Attorney's Office, and Clark and Parsons were eventually charged with federal crimes. They pleaded guilty and were sent to prison.

Buffets sought to recover its losses by filing a claim with plaintiff Hartford under an employee-theft insurance policy. In response, Hartford has paid almost $3 million to Buffets. Hartford now seeks to recoup those payments by bringing this subrogation action against Clark, Parsons, and Transgroup. As Buffets's subrogee, Hartford stands in Buffets's shoes and can recover from the defendants to the same extent — but only to the same extent — that Buffets could recover if it sued the defendants directly.

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## B. *Hartford's Claims*

Hartford's complaint asserts six claims against Transgroup.  Count 2 alleges intentional misrepresentation; Count 3 alleges negligent misrepresentation; Count 4 alleges conversion; Count 5 alleges unjust enrichment; Count 6 alleges aiding and abetting a breach of fiduciary duty; and Count 7 alleges civil conspiracy.  Hartford seeks summary judgment on only four of these six claims — Count 2 (intentional misrepresentation), Count 5 (unjust enrichment), Count 6 (aiding and abetting a breach of fiduciary duty), and Count 7 (civil conspiracy).  Moreover, Hartford relies only on a theory of vicarious liability.  Mem. Supp. Pl. Mot. S.J. ("Hartford SJ Mem.") at 2-3 [Docket No. 207].

For its part, Transgroup argues that it is entitled to summary judgment on all of Hartford's vicarious-liability claims because Carr Freight was not Transgroup's actual or apparent agent.  Mem. Supp. Def. Mot. S.J. ("Transgroup SJ Mem.") at 1 [Docket No. 212].  Transgroup further contends, with respect to three claims — Count 3 (negligent misrepresentation), Count 4 (conversion), and Count 5 (unjust enrichment) — that it is entitled to summary judgment insofar as these claims are predicated on a theory of direct (rather than vicarious) liability.  *Id.* at 32-34

The Court found it difficult to discern from the parties' pleadings and briefing precisely what claims (if any) Hartford asserts solely on a theory of vicarious liability, what claims (if any) Hartford asserts solely on a theory of direct liability, and what claims (if any) Hartford asserts on both theories.  At oral argument, however, Hartford conceded that its only remaining direct-liability claim is the unjust-enrichment claim asserted in Count 5.  Otherwise, Hartford made clear, it is only seeking to hold Transgroup vicariously liable.

This was a wise concession, for two reasons.  First, the Court held in its September 2007 summary-judgment order that Hartford had abandoned any direct-liability claims raised in Counts 2, 6, and 7, and that holding was not disturbed on appeal.  Order Sept. 4, 2007 at 16. Second, Transgroup moved for summary judgment on any direct-liability claims raised in Counts 3 and 4, and Hartford did not respond in any way, thereby abandoning any such claims. Transgroup SJ Mem. at 33-34; Mem. Opp. Transgroup Mot. S.J. ("Hartford SJ Opp.") at 19-20 [Docket No. 216] (substantively responding only to Transgroup's arguments about direct liability on Count 5 (unjust enrichment)).  Accordingly, the only remaining direct-liability claim asserted by Hartford is Count 5, for unjust enrichment.

One puzzle remains, however:  Does Hartford continue to assert that Transgroup is *vicariously* liable on Count 3 (negligent misrepresentation) and Count 4 (conversion)?  Again, Hartford seeks summary judgment on only Counts 2, 5, 6, and 7; it offers no explanation for why it does not seek summary judgment on Counts 3 and 4.  For its part, Transgroup argued generally that it cannot be held vicariously liable on *any* claim, but it did not make any arguments specific to Counts 3 and 4.  Hartford, of course, responded generally to Transgroup's general arguments. Under these circumstances, the Court cannot find that Hartford has abandoned whatever vicarious-liability claims it intended to assert in Counts 3 and 4 of its complaint.

That said, any claims — direct or vicarious — for negligent misrepresentation seem doomed.  Parsons and Carr Freight defrauded Buffets deliberately, not negligently — and, if Parsons and Carr Freight cannot be held directly liable for negligent misrepresentation, Transgroup cannot be held vicariously liable for negligent misrepresentation.  But Transgroup has not opposed Count 3 on this ground.

-5-

As for Count 4, a vicarious-liability claim for conversion is not so obviously doomed, although it probably adds little to Hartford's chances of recovery. Again, though, the Court has not considered any arguments specific to such a claim because neither party has made any such arguments. Under the circumstances, the Court will proceed on the assumption that Hartford continues to assert that Transgroup is vicariously liable on all of Counts 2 through 7.

### 1. Vicarious-Liability Claims

Hartford contends that, based on the undisputed facts, any reasonable jury would have to find that Carr Freight was Transgroup's agent and that Parsons, as Carr Freight's agent, was Transgroup's subagent. Based on the same undisputed facts, Transgroup contends that *no* reasonable jury could find that Carr Freight was Transgroup's agent or that Parsons was Transgroup's subagent. Overall, Hartford and Transgroup do not seriously disagree about the relevant law, nor do they seriously disagree about the relevant facts. Rather, each emphasizes *different* facts to support its argument for summary judgment, and each relies on its own *interpretation* of the facts.

But weighing the significance of the facts is the jury's job, not the Court's. As the Court explained at oral argument, certain facts point toward a finding that Carr Freight was Transgroup's actual or apparent agent, and other facts point away from such a finding. On this record, the Court cannot grant summary judgment on the overarching question of agency. That question will have to be tried.

Three narrower issues, however, merit further analysis. First, Transgroup contends that because Parsons's fraud was unforeseeable, Transgroup cannot be held vicariously liable for that fraud even if Parsons was Transgroup's actual or apparent subagent. Second, Transgroup

contends that Parsons can be found to be Transgroup's subagent on a theory of apparent agency only if Transgroup held out Parsons himself — and not just Carr Freight — as Transgroup's agent. Transgroup did not hold out Parsons himself as its agent, and thus, Transgroup argues, Transgroup cannot be held vicariously liable for Parsons's actions on a theory of apparent agency. Third, Transgroup contends that Buffets had a duty to inquire into Parsons's relationship with Transgroup, that Buffets failed to fulfill this duty, and that this is another reason why Transgroup cannot be held liable for Parsons's actions on a theory of apparent agency. The Court addresses these arguments in turn.

### a. Foreseeability

Under Minnesota law, an employer is vicariously liable for the intentional tort of an employee only if "(1) the tort is related to the employee's duties; and (2) the tort occurs within work-related limits of time and place." *Hagen v. Burmeister & Assocs., Inc.*, 633 N.W.2d 497, 504 (Minn. 2001); *see also Fahrendorff ex rel. Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 910-12 (Minn. 1999); *Lange v. Nat'l Biscuit Co.*, 211 N.W.2d 783, 785-86 (Minn. 1973). To be sufficiently related to the employee's duties to support vicarious liability, an employee's tort must be foreseeable. *Frieler v. Carlson Mktg. Group, Inc.*, 751 N.W.2d 558, 582-84 (Minn. 2008) (Gildea, J., opinion and dissent, Part II, writing for the court on this issue); *Hagen*, 633 N.W.2d at 504.

The Court cannot overstate the importance of the foreseeability requirement under Minnesota law. The most recent decision of the Minnesota Supreme Court on when intentional torts are committed within the scope of employment turns on foreseeability. *Frieler*, 751 N.W.2d at 582-84 (Gildea, J., opinion and dissent, Part II, writing for the court on this issue).

The most recent decision of the Minnesota Court of Appeals on the same subject also turns on foreseeability. *Buckles v. State*, No. A08-2098, 2009 Minn. App. Unpub. LEXIS 926, 2009 WL 2498635, at *2-4 (Minn. Ct. App. Aug. 18, 2009). And a very recent decision of the Minnesota Court of Appeals labels foreseeability the "critical inquiry" in deciding whether an intentional tort occurred within the scope of employment. *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 47 (Minn. Ct. App. 2009).

Transgroup does not dispute that Parsons's fraud occurred within work-related limits of time and place. But Transgroup contends that, even if Parsons was its agent or subagent, Transgroup cannot be vicariously liable for Parsons's fraud because the fraud was unforeseeable and therefore unrelated to Parsons's employment. Transgroup SJ Mem. at 28-31.

Hartford said nothing about foreseeability in its opening brief in support of its summary-judgment motion, choosing instead to argue that Transgroup was liable for Parsons's acts because he committed them "within the scope" of his agency. Hartford SJ Mem. at 26-28. Only when responding to Transgroup's summary-judgment motion did Hartford join issue on the question of foreseeability.

Hartford responded with two arguments. First, Hartford said that it was Transgroup's burden to show that Parsons's actions were *not* foreseeable, rather than Hartford's burden to show that the actions *were* foreseeable. Hartford SJ Opp. at 13-14. Hartford's argument is flatly contradicted by the multiple decisions of the Minnesota Supreme Court and Minnesota Court of Appeals cited above. *See, e.g., Frieler*, 751 N.W.2d at 584 (Gildea, J., opinion and dissent, Part II, writing for the court on this issue) ("[T]o survive summary judgment on a claim that an employer is liable for an employee's intentional tort under the doctrine of respondeat superior,

the *plaintiff* must present sufficient evidence to raise an issue of fact with respect to the foreseeability of such misconduct by the employee." (emphasis added)).

Second, Hartford argued that Transgroup can be vicariously liable for Parsons's fraud merely because Parsons falsified shipping invoices, and preparing shipping invoices was a central feature of his employment. Hartford SJ Opp. at 14-18. This argument was based largely on non-Minnesota cases and failed to address, in any thoughtful or genuine manner, the foreseeability requirement as set forth in *Lange, Fahrendorff*, *Hagen*, and *Frieler.* Instead, Hartford reiterated its assertion that "Transgroup is liable in this case because Parsons'[s] acts were within the scope of his subagency." Hartford SJ Opp. at 17. Hartford said that this settled the foreseeability question, arguing that "[a]s a matter of law, Parsons'[s] actions to defraud Buffets could have been foreseen by Transgroup because those actions were plainly within the scope of Carr Freight's agency with Transgroup." *Id.* at 14.

But Hartford has the inquiry exactly backwards. To determine whether a tortious act was within the scope of an agency, one must *first* ask whether the act was foreseeable. When pressed on the foreseeability requirement at oral argument, Hartford contended — with no support from Minnesota case law — that the foreseeability requirement applies only to torts (such as sexual misconduct) that are entirely unrelated to an employee's job duties, not to torts (such as preparing fraudulent invoices) committed in the course of fulfilling job duties. But, as the Minnesota Supreme Court made clear in *Hagen*, "an important consideration in determining whether an act is related to the duties of employment is whether the act was foreseeable." 633 N.W.2d at 504. The Minnesota Court of Appeals has made the same point: "The critical inquiry to determine if the source of the harm is related to the duties of the employee is whether the

employee's acts were foreseeable." *Yath*, 767 N.W.2d at 47. In other words, when one asks whether an act was foreseeable, one is asking whether the act was related to the employee's job duties. Acts that are unforeseeable are, because of that very unforeseeability, *unrelated* to an employee's job duties.

In *Hagen* itself, the tort to which the court applied a foreseeability requirement was the solicitation by an insurance agent of customers from a list that was allegedly a stolen trade secret. 633 N.W.2d at 500-02. In light of *Hagen*, the Court rejects Hartford's argument that a foreseeability requirement applies only with respect to intentional torts that are obviously unrelated to an employee's job duties. Minnesota law leaves no doubt that a plaintiff seeking to hold an employer vicariously liable for the intentional tort of an employee must prove that the employee's intentional tort — of whatever kind — was foreseeable.

Foreseeability in this context is a question of fact. *Frieler*, 751 N.W.2d at 583-84. A plaintiff need not prove that an employer actually foresaw that the particular employee would commit the particular tortious act. *Hagen*, 633 N.W.2d at 505. Rather, it is sufficient for a plaintiff to show that "an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* (internal quotation marks omitted). Under this standard, "foreseeability is commonly proven, or a question of fact is raised, when a party establishes that the type of tortious conduct involved is a well-known industry hazard." *Id.*

Hartford has offered no evidence that in the interstate-shipping "industry" there is a "well-known . . . hazard" of collusion between shippers and their customers' shipping managers to fraudulently inflate bills to generate kickbacks. Indeed, because Hartford ignored the relevant

-10-

Minnesota law about foreseeability, Hartford said nothing in its briefs about what record evidence would support a finding that Parsons's fraud was foreseeable to Transgroup. At oral argument, however, Hartford said that the fraud was foreseeable in light of evidence that Transgroup knew how much Carr Freight's invoices to Buffets were marked up over the actual cost of shipment, and that Carr Freight's markups were so far out of line with ordinary markups in the industry that Transgroup should have suspected that something was amiss. Although the question is close, the Court agrees with Hartford that, at least with respect to some periods of time, the record contains sufficient evidence of extraordinary markups by Carr Freight to permit a jury to find that Parsons's fraud was foreseeable to Transgroup.

When Carr Freight arranged interstate shipments for Buffets, Carr Freight contracted with third parties to ship the goods, charged Buffets more than Carr Freight's cost, and kept most of the difference between the charge to Buffets and the cost to Carr Freight. Transgroup does not deny that, because it handled the invoices and accounting for Carr Freight's interstate shipments, Transgroup knew Carr Freight's actual costs for each shipment and knew the amount that Carr Freight marked up those costs on the invoices to Buffets. *See* Santillan Aff. ¶ 7 [Docket No. 213] ("Upon completion of the shipping, Carr Freight would invoice their customers using the Transgroup bill of lading form. . . . Transgroup would collect the money from Carr Freight's customers and pay the various vendors involved in the transportation."). Transgroup *does* argue that it never analyzed Carr Freight's markups. *See* Santillan Aff. Opp. Hartford Mot. S.J. ¶ 8 [Docket No. 220] ("Transgroup does not set, analyze or control any markup on rates charged by an ICO [such as Carr Freight].") But Transgroup's failure to analyze those markups does not change the fact that Transgroup knew the size of those markups.

The report of Transgroup's own expert, Joseph D. Kenyon, shows that in 2000 and 2001, Carr Freight's markups on shipments for Buffets were grossly out of line with industry norms. Grote Aff. Opp. Hartford Mot. S.J. [Docket No. 221] Ex. 3 ("Kenyon Rep."). Kenyon analyzed billings by Transgroup-affiliated companies similar to Carr Freight from 1997 to 2001 and found that the average markup by those companies was 135 percent.[1] Kenyon Rep. App. VII. The highest markup in 2000 for a company similar to Carr Freight was 143 percent, and the highest such markup in 2001 was 253 percent. Kenyon Rep. App. VIc, App. VId (entries for Action Logistics in Detroit, Michigan). Yet Carr Freight, on its shipments for Buffets, added a markup of 414 percent in 2000 and 601 percent in 2001. *See* Kenyon Rep. App. II.[2] A reasonable jury could find from this evidence that Parsons's fraud, at least for this limited period of time, was foreseeable to Transgroup.

---

[1]The Court uses the term "markup" to mean the amount or percent *above cost* charged to a customer — that is, the amount that the cost has been "marked up." Thus, if a shipper's cost is $75 and it charges a customer $100, the markup is $25, or 33.3 percent. But Kenyon uses the term "markup" to mean the ratio of charges to cost. Thus, according to Kenyon's terminology, in the example just given the markup would be $100/$75, or 133.3 percent. The Court has translated Kenyon's numbers into its own terminology. Thus, where Kenyon says that the average markup from 1997 to 2001 by companies like Carr Freight was 2.35, or 235 percent, the Court says that the average markup was 135 percent.

[2]In 2000, Carr Freight charged Buffets $1,250,415 for shipping, but Carr Freight paid carriers only $243,185 for those shipments. This reflects a markup of 414 percent (calculated as follows: $1,250,415 − $243,185 = $1,007,230 (markup in dollars); $1,007,230/$243,185 = 4.14 = 414% (markup in percent)). *See* Kenyon Rep. App. II.

In 2001, Carr Freight charged Buffets $523,861 for shipping, but Carr Freight paid carriers only $74,734 for those shipments. This reflects a markup of 601 percent (calculated as follows: $523,861 − $74,734 = $449,127 (markup in dollars); $449,127/$74,734 = 6.01 = 601% (markup in percent)). *See id.*

### b. *"Holding Out" of Subagents*

Transgroup does not dispute that Parsons was Carr Freight's agent. And Transgroup acknowledges that Carr Freight, as a corporation, could act only through agents such as Parsons. But Transgroup argues that even if *Carr Freight* was Transgroup's actual or apparent agent, Transgroup cannot be found liable on an apparent-agency theory for the actions of Parsons unless Transgroup held out *Parsons himself* — not just Carr Freight — as its agent. Transgroup SJ Mem. at 22-24. Unfortunately for Transgroup, however, this assertion is refuted by the very authority on which Transgroup relies.

According to § 3.15 of the Third Restatement of Agency, "[a] subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) of Agency § 3.15 (2006); *see also* Restatement (Second) of Agency § 5 (1958); *Wolfson v. Beris*, 295 N.W.2d 562, 565 (Minn. 1980) (citing Restatement (Second) of Agency § 5(1)); *In re Nat'l Audit Def. Network*, 332 B.R. 896, 920-21 (Bankr. D. Nev. 2005) (discussing agency and subagency). Comment d to § 3.15 provides in part:

> As between a principal and third parties, it is immaterial that an action was taken by a subagent as opposed to an agent directly appointed by the principal. In this respect, subagency is governed by a principle of transparency that looks from the subagent to the principal and through the appointing agent. As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent.

Restatement (Third) of Agency § 3.15 cmt. d (2006).

Transgroup quotes the first two sentences of this comment to support its argument that unless Transgroup held out Parsons himself as its subagent, Transgroup cannot be liable for

Parsons's actions on a theory of apparent authority.  Transgroup SJ Mem. at 22 n.6.  As best as the Court can tell, Transgroup is misreading the second sentence and ignoring both the first (which Transgroup quotes) and the third (which Transgroup omits).  According to the first sentence, "[a]s between a principal" — here, Transgroup — "and third parties" — here, Buffets — "it is *immaterial* that an action was taken by a subagent" — here, Parsons — "as opposed to an agent directly appointed by the principal" — here, Carr Freight.  (For the sake of this particular argument, Transgroup does and must assume that Carr Freight is its actual or apparent agent.)  Restatement (Third) of Agency § 3.15 cmt. d (2006) (emphasis added).

Surely this means what it says:  If a principal is responsible for its agent's actions, the principal is also responsible for the actions of its agent's agents (i.e., the principal's subagents).  Indeed, this is exactly what the third sentence quoted above says:  "[A]n action taken by a subagent [Parsons] carries the legal consequences for the principal [Transgroup] that would follow were the action instead taken by the appointing agent [Carr Freight]."  *Id.*

The second sentence of the comment says that "subagency is governed by a principle of transparency that looks from the subagent [Parsons] to the principal [Transgroup] and through the appointing agent [Carr Freight]."  *Id.*  It appears that Transgroup somehow construes this to mean that the "appointing agent" (here, Carr Freight) should be disregarded when considering a principal's liability for a subagent's actions and that the principal's liability should be determined by looking only at the relationship between the subagent and the principal.  But looking "through the appointing agent" is not the same as pretending that the appointing agent does not exist.  The context makes abundantly clear that the "principle of transparency" is simply this:  A principal is liable for the actions of its agent's agent — that is, the principal's subagent.

In this case, that means that Transgroup can be held liable for the actions of Parsons if Carr Freight was either an actual agent or an apparent agent of Transgroup.

Other comments to § 3.15 of the Restatement (Third) of Agency reinforce the conclusion that if Transgroup is liable for Carr Freight's actions (whether on a theory of actual or apparent agency), then Transgroup is liable for the actions of Parsons. Comment b provides in part:

> A person appointed by an agent to act on behalf of the agent's principal is a subagent if the appointing agent has agreed with the principal that the appointing agent shall be responsible to the principal for the agent's conduct. Such agreement may be express or implied. . . . When an agent is itself a corporation or other legal person, its officers, employees, partners, or members who are designated to work on the principal's account are subagents.

Restatement (Third) of Agency § 3.15 cmt. b (2006). Similarly, comment c provides in part: "A principal's consent to the appointment of a subagent may be express or implied. . . . Implied consent to appoint subagents is . . . present when an agent is itself a person that is not an individual, such as a corporation." *Id.* cmt. c.

Finally, the two cases cited by Transgroup do not support Transgroup's argument that it cannot be liable for Parsons's actions on a theory of apparent agency unless it held out Parsons himself (and not just Carr Freight) as its agent. In *Wells Fargo Financial Leasing, Inc. v. LMT Fette, Inc.*, the Eighth Circuit upheld a district court's ruling that misrepresentations made by Joe Nader, an employee of an office-equipment vendor, could not be attributed to Wells Fargo on a theory of actual or apparent agency. 382 F.3d 852, 856 (8th Cir. 2004). Nader apparently said that he was Wells Fargo's "subagent," but there is no hint in the Eighth Circuit's opinion that anyone even argued that Nader's employer (the office-equipment vendor) — as opposed to Nader himself — was an actual or apparent agent of Wells Fargo. *Id.* at 855-56. Instead, the

question was whether Wells Fargo had done anything to clothe Nader himself with actual or apparent authority. *Id.* at 856. This reflects a self-evident proposition: A principal *could* directly clothe someone else's agent with actual or apparent authority to act on the principal's behalf. But it does not follow that this is the *only* way that someone else's agent could have actual or apparent authority to act on the principal's behalf.

In the context of this case, if Transgroup had held out Parsons himself as its agent, then Parsons would have had apparent authority to act on Transgroup's behalf. But that does not mean that Transgroup can *only* be held liable for Parsons's actions if it held out Parsons as its agent. Transgroup's holding out Parsons himself, rather than Carr Freight, as its agent would be *sufficient* for liability, but it is not *necessary*.

The second case cited by Transgroup, *Kral, Inc. v. Southwestern Life Insurance Co.*, does not change the analysis. 999 F.2d 101 (5th Cir. 1993). *Kral* involved fraud by Joseph Zeigler in the sale of investment products offered by Southwestern Life Insurance Co. ("Southwestern Life"). Zeigler's wife was a Southwestern Life agent with the authority to sell the products, and she appointed Zeigler as a subagent with limited authority: Zeigler was authorized to solicit applications from customers but not to make sales. *Id.* at 104. The victims of Zeigler's fraud contended that Southwestern Life was liable for Zeigler's fraudulent sales because Zeigler had the apparent authority to make those sales on behalf of Southwestern Life. *Id.*

In considering this argument, the Fifth Circuit noted, unremarkably, that the victims would have to show "that they were induced to act in good faith upon certain representations made by [Southwestern Life], not Zeigler." *Id.* (internal quotation marks omitted). Because Zeigler's actions exceeded the scope of his authority as the agent of his wife (Southwestern

Life's agent), such representations with respect to Zeigler himself — and not just his wife — would have been both sufficient *and* necessary to establish Southwestern Life's liability for Zeigler's fraud. That is, the undisputed fact that Zeigler's wife was Southwestern Life's agent did not, by itself, make Southwestern Life liable for Zeigler's fraudulent sales, because Zeigler's wife had not authorized him to make *any* sales.

In this case, however, a jury could find that Parsons had unlimited authority to act on Carr Freight's behalf. Unlike Zeigler, Parsons acted within the scope of the authority that had been conferred on him by the agent of the principal. Thus, under *Kral*, it was not necessary that the principal (Transgroup) make representations directly to the victim (Buffets) about the subagent (Parsons), because the subagent (Parsons) was acting within the authority conferred on him by the principal's agent (Carr Freight). Put differently, if Transgroup cloaked Carr Freight with apparent authority to act as Transgroup's agent, then that apparent authority necessarily extended to Parsons — the person through whom Carr Freight acted.

### c. Duty of Inquiry

Transgroup contends that Buffets failed to inquire into Parsons's relationship with Transgroup and that, as a result, Transgroup cannot be held liable for Parsons's actions on a theory of apparent agency. Transgroup SJ Mem. at 25; Transgroup Mem. Opp. Hartford Mot. S.J. ("Transgroup SJ Opp.") at 21-22 [Docket No. 219]. The Court disagrees.

Transgroup is correct that under Minnesota law, "one who deals with an agent is put to a certain burden of reasonableness and diligence." *Truck Crane Serv. Co. v. Barr-Nelson, Inc.*, 329 N.W.2d 824, 827 (Minn. 1983). And Minnesota cases have sometimes described this burden in broad terms. For instance, *West Concord Conservation Club, Inc. v. Chilson* said:

"Every person who undertakes to deal with an agent is put on inquiry and must discover whether the agent has the authority to complete the proposed act."  306 N.W.2d 893, 896 (Minn. 1981); *see also Truck Crane*, 329 N.W.2d at 827 (quoting *West Concord Conservation Club*).

Obviously, though, this broad language is not meant to be taken literally.  For example, "[e]very person" who walks into a McDonald's restaurant and "who undertakes to deal with an agent" by ordering a hamburger is not "put on inquiry" to ask questions of the person taking her order to "discover whether the agent has the authority to complete the proposed act."  Commerce would grind to a halt if the broadest language in cases such as *West Concord Conservation Club* were literally applied.

Not surprisingly, then, the case law supports reading this language narrowly.  Specifically, when courts have held that a party dealing with an apparent agent failed of the duty of inquiry with respect to the agent's authority, that party had become aware of some reason to doubt whether the apparent agent had authority to act on behalf of the principal.  In *Truck Crane*, for instance, the plaintiff had been told by the president of Barr-Nelson that the company would not pay certain disputed bills.  329 N.W.2d at 826.  The plaintiff then negotiated with a different employee of Barr-Nelson about the same bills, and that employee signed an agreement, purportedly on behalf of the company, to pay the bills.  *Id.*  That employee lacked actual authority to bind Barr-Nelson to pay the disputed bills, and the court rejected the plaintiff's argument that the employee had apparent authority, observing that "[t]he fact that the plaintiff . . . had been notified in writing by Barr-Nelson's president that Barr-Nelson denied liability for these services *put the plaintiff on inquiry* as to the authority of any other Barr-Nelson employee to countermand such a position."  *Id.* at 827 (emphasis added).

-18-

Similarly, in *West Concord Conservation Club*, the court held that the Conservation Club was not bound by the acts of a person who was not its actual agent when the party on the other side of the transaction was "*placed on inquiry notice* as to the claims of the Conservation Club." 306 N.W.2d at 897 (emphasis added). *West Concord Conservation Club* involved a purported sale of the Conservation Club's property by a member of the Conservation Club who lacked actual authority to sell the property on the organization's behalf. Although the seller, Wilmar Plevke, represented to the buyer that he did have authority to sell the property of the Conservation Club, *id.* at 895, the buyer had the Conservation Club's records before closing, and those records "would have indicated that there had not been a meeting of the members of the [Conservation Club's] board authorizing the [sale]," and "that Plevke was not the president [of the Conservation Club] and did not have the power to sell the club property." *Id.* at 896-97. Because "a reasonable investigation would have revealed" that Plevke could not sell the Conservation Club's property, the court held that the Conservation Club was not bound by Plevke's actions. *Id.* at 896.

These cases stand for the proposition that a party who deals with an apparent agent must make an inquiry into that agent's authority that is *reasonable under the circumstances*. In most circumstances — such as when a customer walks into a McDonald's and orders a hamburger — no inquiry into the authority of an apparent agent is necessary. In this case, Transgroup has suggested no reason why Buffets should have inquired into Carr Freight's authority to act on behalf of Transgroup or Parsons's authority to act on behalf of Carr Freight.

Moreover, even if Buffets *had* made a reasonable inquiry, that inquiry would have revealed that Carr Freight and Parsons had actual authority to do everything that they were doing

— except, of course, fraudulently inflating invoices.  There is no dispute that Parsons was entitled to act on behalf of Carr Freight, and there is no dispute that Carr Freight was entitled to use Transgroup's name and Transgroup's paperwork to arrange shipments for Buffets.  And a *reasonable* inquiry into Carr Freight's authority to act as Transgroup's agent would not have raised the nonsensical question, "Does Carr Freight (or Parsons) have the authority to fraudulently inflate invoices on Transgroup's behalf?"

The Court therefore finds, as a matter of law, that Buffets did not fail of its duty of inquiry with respect to Carr Freight's authority to act as Transgroup's agent or with respect to Parsons's authority to act as Carr Freight's agent.  Whether Carr Freight was in fact Transgroup's actual or apparent agent is, as noted above, a jury question.

## 2.  Unjust Enrichment

Transgroup does not deny that it was *actually* enriched by Parsons's fraud.  Nor could it. Because of Parsons's fraud, Buffet's shipping costs were grossly inflated, and Transgroup took an 11 percent cut of those grossly inflated payments.  Transgroup contends, though, that it was not *unjustly* enriched for purposes of Minnesota law because it was Parsons, and not Transgroup, who actually committed the fraud.  Transgroup SJ Mem. at 32.  The Court disagrees with Transgroup's understanding of Minnesota law and holds that a jury could find that Transgroup was unjustly enriched.

As Transgroup notes, *First National Bank of St. Paul v. Ramier* held that "unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."  311 N.W.2d 502, 504 (Minn. 1981).  But *First*

*National Bank*'s narrow description of unjust-enrichment claims — its suggestion that only someone who breaks the law can be unjustly enriched — is inconsistent with broader descriptions appearing in other decisions of the Minnesota Supreme Court.

As far back as 1882, the Minnesota Supreme Court said in *Brand v. Williams* that a claim for unjust enrichment "can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over." 13 N.W. 42, 42 (Minn. 1882). Almost a century later, the court described a claim for unjust enrichment the same way, quoting *Brand*. *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494-95 (Minn. 1971). And the court has specifically said that unjust-enrichment claims may be based on "situations where it would be *morally wrong* for one party to enrich himself at the expense of another." *Cady v. Bush*, 166 N.W.2d 358, 361-62 (Minn. 1969) (emphasis added); *see also Klass*, 190 N.W.2d at 495 (quoting *Cady*); *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) ("While respondents argue that their conduct has not been shown to be illegal, the cause of action for unjust enrichment has been extended to also apply where, as here, the defendants' conduct in retaining the benefit is morally wrong.").

No one claims that Transgroup acted "illegally or unlawfully." But could a Minnesota court find it "morally wrong" for Transgroup to retain roughly 11 percent of Carr Freight's fraudulent billings to Buffets? Put another way, under Minnesota law, if an innocent third party receives money that was generated by fraud, can the defrauded party recover that money from the innocent third party on a claim for unjust enrichment? The answer is not entirely clear, but based on a previous opinion of this Court and on unpublished decisions of the Minnesota Court

of Appeals, the Court believes that the Minnesota Supreme Court would answer this question "yes."

In *Honeywell/Alliant Techsystems Federal Credit Union v. Buckhalton*, the plaintiff, a credit union, sought to recover money that a borrower had fraudulently transferred to the defendants. No. C2-99-1194, 2000 Minn. App. LEXIS 66, 2000 WL 53875 (Minn. Ct. App. Jan. 25, 2000). After noting that there was no evidence that the defendants participated in or even knew of the fraud, the court held that "despite the absence of proof of fraud or illegal conduct on the part of [defendants], because of equity, they are not entitled to the money." *Buckhalton*, 2000 Minn. App. LEXIS 66, at *9. In *Kranz v. Koenig*, this Court relied on *Buckhalton* and another unpublished case from the Minnesota Court of Appeals to hold that "a plaintiff may maintain an unjust enrichment claim against the entity who benefits from the wrongdoing committed by another." 484 F. Supp. 2d 997, 1001 (D. Minn. 2007) (citing *Buckhalton* and *Wells Elec., Inc. v. Schaper*, No. A06-420, 2006 Minn. App. Unpub. LEXIS 1118, 2006 WL 2807179 (Minn. Ct. App. Oct. 3, 2006)).

Given the existence of *Buckhalton* and *Kranz*; given Transgroup's failure to cite any Minnesota case law squarely holding that an innocent person who benefited from another's fraud cannot be liable to the victim for unjust enrichment; and given that Transgroup has no argument that it actually *earned* its cut of Parsons's fraudulent billings, the Court will permit Hartford's unjust-enrichment claim to go forward. Transgroup has refused to return to Buffets — the victim of a crime — money that Transgroup now knows it was not entitled to receive. The Court will not be surprised if the jury forces Transgroup to return its cut of the stolen proceeds, even if

the jury does not hold Transgroup vicariously liable for all of the harm inflicted by Clark and Parsons.

### C. Miscellaneous Issues

### 1. Effect of the Judgment Against Parsons

Hartford filed this action not only against Transgroup, but also against Clark and Parsons. Hartford later voluntarily dismissed its claims against Clark, after the Court pointed out that Hartford had already recovered a judgment against Clark in a bankruptcy proceeding, and thus was precluded from relitigating its claims in this action. Mot. Dism. [Docket No. 174]. After this Court granted summary judgment to Transgroup, Hartford moved for summary judgment against Parsons. Mot. S.J. [Docket No. 160]. Parsons did not oppose that summary-judgment motion in any way. Indeed, Parsons has never even answered the complaint.[3] Hartford's unopposed motion for summary-judgment against Parsons was therefore granted, and judgment in the amount of $2,701,173.90 was entered against Parsons. Order Dec. 6, 2007 [Docket No. 173]; Judgment Dec. 20, 2007 [Docket No. 178].

Hartford now asks the Court to hold, as a matter of law, that if the jury finds Transgroup vicariously liable to Hartford, then Transgroup must pay $2,701,173.90 to Hartford, because that was the amount of the judgment entered against Parsons. Hartford SJ Mem. at 28-34. In other words, Hartford argues that Transgroup is somehow bound by the Court's "finding" — in response to an uncontested motion against a party in default — that Buffets suffered $2,701,173.90 in damages on account of Clark and Parsons's scheme. Hartford makes this

---

[3]As noted, Parsons served time in a federal prison for defrauding Buffets. After he was released from prison, he was deported to England.

argument even though, at the time the Court entered the judgment against Parsons, the Court had already dismissed all of Hartford's claims against Transgroup. At oral argument, Hartford actually argued that, *after being dismissed from the case*, Transgroup should nevertheless have paid *its* lawyers to defend (even at a jury trial, if necessary) the claims against *Parsons* — a codefendant who was in default — just in case the dismissal of the claims against Transgroup was someday reversed on appeal.

Obviously, the result sought by Hartford would be grossly unjust, and, not surprisingly, that result is not compelled by any statute or judicial decision. To support its argument, Hartford cites cases about the vicarious liability of principals for their agents' actions. But whether a principal is liable for an agent's actions is an entirely different question from whether a principal is precluded from litigating an issue that was decided in a lawsuit against its former agent. Whether a ruling against one party — here, Parsons — is binding on a different party — here, Transgroup — is a question of claim or issue preclusion, not of vicarious liability. *See generally* 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* §§ 4448-62 (discussing what parties are bound by judgments in other cases).

The primary case relied on by Hartford, *Kisch v. Skow*, 233 N.W.2d 732 (Minn. 1975), is not to the contrary. The defendant in that case, Skow, successfully argued to the trial court that service against him should be quashed because in an earlier suit, the plaintiff had failed to join Skow even though Skow had been a necessary party under Rule 19 of the Minnesota Rules of Civil Procedure. *Id.* at 329-30. The Minnesota Supreme Court — in light of evidence that Skow knew of, and could have joined, the earlier suit — rejected Skow's procedural argument, holding:

[Skow] cannot assert that he should have been associated with the first suit when he must be deemed to have elected not to be so associated, nor can he claim, at the same time, freedom from suit in the second action because he should have been made a party in the earlier action.

*Id.* at 334-35.  The court vacated the district court's order quashing service on Skow — and that is all it did.  *Id.* at 335.  *Kisch* does not support the unheard-of proposition that a judgment against a former agent is enforceable against a principal if the principal knew of the lawsuit that led to the judgment.

### 2. Pre- and Post-Judgment Interest

Based on the assumption that the Court will grant its summary-judgment motion, find Transgroup liable, and award judgment in the amount of $2,701,173.90 (because that was the amount of the judgment against Parsons), Hartford asks the Court to award pre- and post-judgment interest.  Hartford SJ Mem. at 34-35.  The Court is denying Hartford's summary-judgment motion, though, and thus the Court will not now decide any questions related to pre- and post-judgment interest.

### 3. Comparative Fault

Transgroup argues that, if a trial is necessary, then the jury should be asked to determine the extent of Buffets's comparative fault in connection with Clark and Parsons's fraud.  Transgroup SJ Opp. at 23-24.  Transgroup asserts that because its liability (if any) is vicarious and not direct, Hartford's recovery should be limited because Buffets was partly to blame for the fraud.  But in *Florenzano v. Olson* — the very case that Transgroup cites for general principles of comparative fault — the Minnesota Supreme Court said:  "Without question, principles of comparative negligence would *not* apply to an intentional tort; we have never so applied them."

387 N.W.2d 168, 175 (Minn. 1986) (emphasis added). Far from supporting Transgroup's argument for the application of comparative-fault principles to intentional-tort claims based on vicarious liability, *Florenzano* refutes it.

### 4. Statute of Limitations

Transgroup contends that Hartford's claims with respect to at least some fraudulent invoices are untimely. Transgroup SJ Mem. at 34. But there is a factual dispute over when Buffets should have learned (or did learn) of Clark and Parsons's fraud. Given that this case must go to trial, and given that Transgroup devoted a single paragraph to this question in its summary-judgment brief, the Court will not decide what portion of Hartford's claims may be barred by the statute of limitations. That issue will be decided by the jury.

### 5. Evidentiary Issues

Transgroup argues that Parsons's plea agreement, which Hartford cites in support of its motion for summary judgment and presumably will seek to introduce at trial, is inadmissible. And, indeed, it seems clear that the plea agreement cannot be offered into evidence to prove the truth of the matters asserted in that plea agreement. That would be hearsay, *see* Fed. R. Evid. 801(c), and hearsay is barred by Fed. R. Evid. 802.

But Hartford insists that both Parsons's and Clark's plea agreements are admissible under Fed. R. Evid. 803(22), which creates an exception to the hearsay rule for "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty . . . , adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment . . . ." Hartford Reply Mem. Supp. Mot. S.J. ("Hartford SJ Reply") at 7-8 [Docket No. 223]. Hartford is incorrect. A plea agreement is not a "final judgment." A plea agreement

is not even a "plea of guilty."  A plea agreement is an agreement between the government and a defendant.  In that agreement, the defendant promises that he will, in the future, enter a plea of guilty.  And if a court accepts that plea, a final judgment will be entered.  Thus, a plea agreement is at least two steps removed from a final judgment.

In arguing otherwise, Hartford misreads *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978).  *Rozier* held that a "certified copy of [a criminal defendant's] guilty plea" was not hearsay under Fed. R. Evid. 803(22).  *Id.* at 1346-47.  The Court has doubts about that holding; as just explained, a plea of guilty is not the same thing as "a final judgment, entered . . . upon a plea of guilty."  A judgment is the act of a court, while a plea is the act of a defendant, and Fed. R. Evid. 803(22) covers only judgments, not pleas.  In any event, neither Rule 803(22) nor *Rozier* suggests that a plea agreement — which is neither a judgment nor a plea — is admissible under Rule 803(22).

For its part, Hartford asks the Court to strike the second affidavit of Angie Santillan, which was submitted by Transgroup in support of its summary-judgment motion.  Hartford SJ Reply at 2.  The Court will not do so.  There is no rule that prevents a witness who has been deposed from later submitting an affidavit — or giving trial testimony — that includes facts that were not discussed at her deposition.  As long as the witness was disclosed and made available for deposition, she can say whatever she wants in a later affidavit or at trial.  The contrary rule urged by Hartford would lead to absurd results.  As Hartford would have it, a defendant could disclose the identity of a key witness, the plaintiff could depose that witness, and, at the deposition, the plaintiff could ask the witness only one question:  "What is your name?"  Later, when the defendant moved for summary judgment following the close of discovery, the

defendant would be precluded from submitting an affidavit from the witness, since the only fact disclosed by the witness at her deposition was her name. Obviously, that is not the law.

Finally, Hartford contends that a report prepared by Arthur Andersen for Buffets about Clark and Parsons's fraud is a subsequent remedial measure that is inadmissible under Fed. R. Evid. 407. Hartford SJ Reply at 2-3. Rule 407 provides in relevant part:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.

Fed. R. Evid. 407. But the Arthur Andersen report is not itself a "measure" that could have been "taken previously" to Clark and Parsons's fraud; it was an investigation *of* that fraud. The report describes Arthur Andersen's objective this way:

> [Buffets] requested that the Andersen project team provide feedback on any internal control weaknesses noted during our review. Our review focused on the terminated warehouse manager's [i.e., Clark's] activities to determine where potential internal control breakdowns could or did transpire. The primary focus of our work was to assist in the quantification of [Buffets's] Proof of Loss statement. We also performed an assessment of the expense reporting practices within [Buffets] to determine compliance and effectiveness of the current expense reporting policy.

Grote Aff. Supp. Transgroup Mot. S.J. [Docket No. 214] Ex. 16 at B-TM-0018. In other words, Arthur Andersen looked backward, not forward. The purpose of its report was to inform Buffets of what had happened and how it had happened. Based on the report, Buffets presumably *took* subsequent remedial measures, but the *report itself* was not such a measure.

The report thus differs from, for instance, a memorandum directing employees to take steps in the future — steps that, had they been taken in the past, would have prevented the harm at issue in a lawsuit. *Cf. First Sec. Bank v. Union Pac. R.R.*, 152 F.3d 877, 881 (8th Cir. 1998) (holding that a district court did not abuse its discretion in excluding, under Fed. R. Evid. 407, an internal memorandum issued after an accident that instructed employees about where to place railroad cars). The report also differs from evidence of actual changes in a company's accounting practices. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("In September 2004 Baxter hired Deloitte & Touche to beef up financial controls in Brazil . . . . Drawing any inference from this would be incompatible with Fed. R. Evid. 407, which provides that subsequent remedial measures may not be used as evidence of liability."). Accordingly, the Arthur Andersen report is not barred by Fed. R. Evid. 407. The Court expresses no opinion about whether it might be barred by another rule of evidence.

ORDER

1.  The motion of plaintiff Hartford Fire Insurance Company for summary judgment [Docket No. 205] is DENIED.

2.  The motion of defendant Transgroup Express, Inc. for summary judgment [Docket No. 210] is GRANTED IN PART and DENIED IN PART as follows:

    a.  The following counts are DISMISSED IN PART to the extent that they assert direct-liability claims against defendant Transgroup Express, Inc.:

        i.   Count 2 (intentional misrepresentation);

        ii.  Count 3 (negligent misrepresentation);

        iii. Count 4 (conversion);

iv.     Count 6 (aiding and abetting a breach of fiduciary duty); and

v.     Count 7 (civil conspiracy).

b.     The motion is DENIED in all other respects.

Dated: July 21, 2010                          s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge